[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff husband commenced this action for a dissolution of the parties' marriage on the ground of adultery by complaint returnable September 2, 1994 to this court. He also sought custody of the minor children, a fair and equitable division of property, and other relief. The defendant wife denied the allegation of adultery, and in her cross complaint, sought a dissolution on the ground of irretrievable breakdown. She also sought custody and support of the minor children, alimony, an equitable division of the real and personal property, and other relief.
The parties were represented throughout these proceedings by counsel. At trial, both parties testified and submitted financial affidavits and child support guidelines worksheets. The defendant filed written proposed orders. A number of documentary materials, including tax returns, were CT Page 414 introduced into evidence. The plaintiff also called a neighbor of the parties and a bank mortgage officer to testify. The parties were granted time to file posttrial briefs, to include, among other things, proposals to distribute the household furniture and furnishings, a tax planning and cash flow analysis, and premium cost information for the continuation of the wife's coverage under the husband's health insurance policy. At the conclusion of the hearing, the court ordered that all pendente lite orders shall remain in effect, until further order of this court.
From the evidence, I find as follows.
The couple was married on May 24, 1986, in Clearwater, Florida. The wife's birth name was LoAlbo. The husband resided continuously in this state for one year before the filing date of the complaint, September 9, 1994. There are four minor children, all of whom are issue of the marriage, whose names and dates of birth are: Daniella, January 26, 1987; Olivia, October 12, 1988; Selena, September 13, 1990; and Gregory, Jr., July 29, 1992. No other minor children were born to the wife since the date of the marriage.
Neither spouse or the children are recipients of public assistance, all statutory stays have expired and the court has jurisdiction.
The husband is 36 years of age, a high school graduate, and in apparent good physical health. For the past almost eight years, he has been diligently self employed as a business manager for a single client, an automobile and truck dealership. He is responsible for financing and leasing of automobiles, and earned approximately $76,790 in net profits in the preceding twelve months, before deductions for federal, state and self employment taxes and health insurance premiums. His gross weekly income is therefore $1,477 and his net, after allowable deductions, about $950. In addition, he receives $144 per week as rental for an "in-law" apartment, which is part of the jointly-owned family home, of which he now has exclusive possession.
In 1993, he achieved net profits of $88,400, before taxes, and in 1994, he had net profits of $67,564. He described 1993 as an outstanding, unique year in the automobile market. He appears to be both knowledgeable and capable in his field. CT Page 415
The wife is 30 years of age, a high school graduate, with some nursing and business courses completed at community colleges. She had cervical cancer surgery and still undergoes therapy. She has worked as an automobile salesperson, and earned $1,200 gross per month on a part-time basis for a few months in 1994. She worked after the parties' marriage for a short while. She is unemployed at this time, and, after the parties' separation in the summer of 1994, has lived with the four children in a rented dwelling in Florida.
The wife ascribes the cause of the destruction of the marriage to the husband's physical and verbal abuse of her, his excessive drinking, his belittling of her and his need to control her. She concedes that he is very hard working, sometimes working sixty hours during a six-day week, and that he is a good provider.
The husband attributes the cause of the marital breakdown to the wife's relationship with a man whom she met when she went to Florida with the children in the summer of 1994, ostensibly on a vacation. The husband believes her new relationship to be romantic and sexual; she denies this, and claims that the relationship is one of friendship only and platonic.
The reality appears to be that after the birth of the parties' last child, the marriage was foundering. The couple had not had sexual relations and slept apart for a substantial period of time before their separation. They, and consequently, their marriage, were stressed by a number of factors, which included the wife's father's severe heart attack, her own cancer, surgery, radiation, and hormonal therapy, and the life-threatening onset of epileptic seizures suffered by their oldest daughter, which required her hospitalization and extensive treatment.
Under these circumstances, it is unnecessary to determine whether the wife's relationship with her male friend was adulterous or platonic. The relationship, whatever it was, sounded the death knell to a marriage which had already disintegrated. It is significant to note that the parties had discussed reconciliation on a number of occasions, but did little, by way of action, to repair or improve their marriage. The wife refused to return from Florida to reside in the maritally CT Page 416 home. I conclude from the evidence and the credibility of the parties that the marriage has indeed been destroyed irretrievably, and that each spouse must share the responsibility for it.
The couple has accumulated the following assets. These include the marital dwelling at 157 Prospect Hill Road, Noank, Connecticut, which has a value of $285,000,[1] less mortgage of $193,000, leaving equity of $87,000. The wife reports on her financial affidavit a 1987 BMW automobile valued at $3,000; and household furnishings of $30,000. She claims that this latter item includes four oil paintings which have an aggregate value of $12,500. The husband denies possession of some of the paintings, which the wife claims were in the marital dwelling when she left for Florida. The husband reports the 1987 BMW as having a value of $6,000, household furnishings valued at $14,000, bank accounts of $800 and an SEP valued at $9,800. find the BMW to be worth $5,000. Against these reported assets, the parties list liabilities as follows: wife, $66,798, including $48,000 due her parents, and the remainder largely credit card balances; the husband, $27,454, of which $3,800 represents past due real estate taxes on the family home. The remainder of the liabilities are credit card balances. He also testified that he owed two estimated quarterly payments due in 1995 for state and federal income taxes. This liability was not disclosed on his financial affidavit.
The husband claims the $48,000, which was derived from a $50,000 contribution from the wife's parents to the purchase of the marital dwelling, was actually a gift, and not a loan, as the wife asserts. A bank mortgage officer, Margaret Berry, who was involved in the financing for the home purchase, testified that the parties provided the bank with a `gift letter' from the wife's parents. Berry further testified that if the $50,000 would have been a loan, the mortgage financing would not have been approved by the bank. The parties made sporadic payments to the wife's parents, and on their behalf. They characterize these payments differently.
The couple purchased the house for $240,000 in 1990 and made renovations so that the wife's parents could have an `in-law' apartment. They resided in the apartment for about six months and moved to Florida. The house increased in value from the date of purchase. There was no evidence as to whether the incremental increase to its present value was due to the CT Page 417 renovations, inflation, market conditions or other factors.
In the view I take of the case, it is unnecessary to decide whether the $50,000 was a gift or a loan. Even if it were determined to be a gift, the wife's parents would not be bound by that determination, as they are not parties to this case. In any event, it is clear that the funds were derived from the wife's family and must be considered as her contribution to the acquisition, maintenance and appreciation in value of the marital assets pursuant to General Statutes § 46b-81. Moreover, in light of the parties' failure to accumulate any savings of consequence, it is evident that the parents' provision of the $50,000 was critical to the parties' ability to buy the home.
The husband's SEP account derived solely from his employment. During the marriage, the husband's earnings were far greater than those of the wife, and apart from the wife's parents' provision of the $50,000, his monetary contribution to the marriage were far greater than hers. On the other hand, despite the criticism by husband of the wife's homemaking skills, and her attending nursing school and studying for a period of time, she was the primary homemaker and child care giver to the parties' four children. Hence, I conclude that the wife's nonmonetary contributions to the marriage were greater than his.
The husband has superior earnings and earning capacity to that of the wife, and therefore, has a greater opportunity than she has to acquire capital assets and income in the future. This is especially so in view of the wife's health and the uncertainty of her prognosis, the health problems of the oldest child, and the fact that the youngest child is not yet of school age, requiring her to be home (or provide day care) for the children.
The wife has an earning capacity of about $300-$400 per week, when she is able to return to work, which is now doubtful.
The following additional findings are made which pertain to the orders set forth hereinafter. The parties were ordered to participate in the parenting education program, General Statutes § 46b-69a. The husband has failed to do so; the wife attended comparable programs, including counseling, in CT Page 418 Florida.
The child support and arrearage guidelines worksheet submitted by the wife suggests that the husband pay $461 per week for support of the four minor children based on net disposable income of $1,212 per week. The husband's brief and amended worksheet suggests an order of $368 per week (after adjustments for the health insurance premiums for the children) for the four children, based on net disposable weekly income of $771. He claims a deviation from the guidelines because of three factors: the father's substantial visitation expenses ($80 per week as reported on his financial affidavit); the mother's earning capacity; and the father's payment of health insurance premiums.
I find that the mother's worksheet calculation is faulty because it overstates the father's income and does not factor in his payment of the health insurance premiums for the children. She averaged the father's 1993 and 1994 income, and 1993 was an unusual, very high-income year for him. I find the father's worksheet calculation too low, in the light of the understated gross and net incomes and his failure to include the rental income or any portion of it in the calculation of his net disposable income. I further find that his net disposable income for the purpose of determining the presumptive order under the guidelines is about $1,000 per week, the $950 previously found, plus a portion of the gross rental income of $144 per week. This gives rise to a presumptive order of $405 per week for the four children, after adjustment of the health insurance premiums.
I reject the husband's claim for a deviation from the guidelines on each of the grounds claimed. First, I cannot find that his visitation expenses are extraordinary and exist on a substantial and continuing basis. Second, the wife's earning capacity, when considering her health and the needs of her children, is problematical at this time. Moreover, her failure to more fully exploit her earning capacity is balanced by the husband's acceptance of a smaller percentage commission in the light of his relinquishment of some job responsibilities under stress. Third, the health insurance premium has been already accounted for in the guideline calculation. Strangely, neither counsel provided the court with an income tax and cash flow analysis so that a more precise unallocated alimony and support award could be fashioned. As noted, the court requested that CT Page 419 the parties do so in their posttrial briefs.
The court believes that an unallocated order is appropriate, in light of the four children, and the wife's lack of current income (other than child support), when compared with the level of the husband's income, and the deductions now available to him from mortgage interest and real estate tax payments, on at least a short term basis. Such an order would reduce the husband's federal and state income tax liabilities and would result in minimal income tax payments by the wife, as she can declare head of household status with four dependency exemptions. I believe that this would maximize the cash flow available to the family as a whole. The wife's claim of an upward deviation from the guidelines because of the oldest child's needs is rejected for lack of credible evidence of the continuing costs of such needs. I also reject the wife's claim for deviation on the ground that the defendant has intentionally reduced his earning capacity as not proven.
I find in this case that the use of the child support guidelines would be inequitable or inappropriate because of tax planning considerations and that the unallocated alimony and child support order later set forth will not result in a lesser economic benefit to the children.
The parties have also acted in a financially self destructive manner by failing to cooperate, despite having assistance of counsel, with respect to properly titling and registering the 1987 BMW. This caused the wife to incur an unnecessary expense of $150 per month for the lease of a replacement car, while the unused, but usable, BMW sits in the wife's driveway.
The husband's belated claim that the wife and children be ordered to return to Connecticut to live is rejected as unrealistic and not reasonable for several reasons. First, there is no credible showing that such a move would be in their best interests, given the fact that they have resided in Florida for about one and one-half years, are attending school there, are near their grandparents, and the mother has a comprehensive support system for the family in place. Second, the children now need some stability, after having been uprooted by the parties' separation. Third, the children are not represented by an attorney; nor has the father sought an evaluation and recommendation by Family Services, until very shortly before CT Page 420 this trial. Fourth, the father has not obeyed the court order requiring him to participate in the parenting education program. Finally, the father has not, and cannot, unconditionally offer exclusive possession of the family home[2] to the mother and children,] hence his request[3] that they be ordered to resume living in Connecticut, even if the court had the power to do so, is wholly impractical.
In response to the court's inquiry, the parties have agreed to cooperate in filing joint federal and state income tax returns for 1995.
The court has considered all of the factors in General Statutes §§ 46b-62, 46b-81, 46b-82, 46b-84 and 46b-215a and b in the light of the evidence and its findings in the fashioning of the orders set forth. I have also considered the taxable implications of the financial awards.
Accordingly, the following is ordered.
(1) A decree dissolving the marriage on the ground of irretrievable breakdown shall enter.
(2) Joint legal custody of the four minor children is awarded to the parents with primary physical custody to mother.
(3) The father shall have liberal rights of visitation to include the following: two consecutive weeks in Florida between Christmas Day and February 15; four consecutive weeks during the summer in Connecticut; one weekend per month from Friday night to Sunday night in Florida. All visitation to be on two weeks' prior written notice by husband. The parties shall equally share the cost of the children's transportation for the summer visitation; the father shall bear the cost of all other transportation related to visitation.
(4) The plaintiff shall pay to the wife as unallocated periodic alimony and support the sum of $520 per week, modified to $35 per week alimony on October 1, 1997; said orders shall terminate upon the death of either party, the wife's remarriage or her cohabitation, whichever occurs first. Upon termination of the unallocated order on October 1, 1997 or sooner, the husband shall commence to pay the sum of $101.25 per child per week as child support, for a total of $405 per week. CT Page 421 The parties are obligated to support the children as required by General Statutes § 46b-84 as amended by 1994 Public Acts. No 94-61.
(5) The wife shall be entitled to claim as a dependency exemption one child for each calendar quarter in 1996 and 1997 for which the husband has paid the unallocated alimony and support order. The husband shall be entitled to the remaining exemptions. In 1998 and succeeding years, when the husband is paying the child support order above referred to, he shall be entitled to claim all four dependency exemptions, so long as he is current as of the end of such calendar year, excepting, that in any calendar year in which the wife earns $15,000 or more gross income, she may claim one. The wife shall execute and deliver any forms required to facilitate the husband's dependency claims. The court retains jurisdiction to modify this provision.
(6) The family home at 157 Prospect Hill Road, Noank, Connecticut, shall be sold forthwith. The parties shall cooperate in the sale, and all incidentals thereof. Any bona fide offer, made by a buyer with a pre-approved mortgage, within 2 percent of the listing price, received more than thirty days after such listing price was established, shall be accepted. The court shall retain jurisdiction over the terms and provisions of the sale. The net proceeds of the sale, after deduction of the first mortgage, and the customary and usual closing costs, including a real estate commission, a reasonable attorney's fee and conveyance taxes, etc., shall be distributed as follows: the first $40,000 thereof to the wife; the next $10,000 shall be applied to joint credit card obligations; the remainder shall be divided equally. Until the sale, the husband shall pay the mortgage principal and interest payments, homeowner's insurance and taxes; any past due taxes and mortgage payments shall be paid from his portion of the net proceeds. He shall be entitled to the rental income until the sale. The wife shall indemnify and save harmless the husband from any claim made by her parents respecting the $50,000 they furnished to the parties.
(7) There is vested in and assigned to the wife the following personal property: the tangible personal property now in her possession, the 1987 BMW automobile, and 20 percent of the husband's SEP account, by Qualified Domestic Relations Order (QDRO); and, the following items of personalty in the marital CT Page 422 dwelling: all of the oil paintings, her personal effects and jewelry.
The court retains jurisdiction over the QDRO until accomplished.
(8) There is vested in and assigned to the husband the following personal property: his 1992 Buick automobile, his bank accounts reported on his financial affidavit and the remainder of his SEP account, and the following items of personalty in the dwelling: his jewelry, clothing and personal effects.
(9) The balance of the items of tangible personal property remaining in the marital dwelling shall be divided as follows: wife shall choose one item, the husband shall choose one item, and so on, until all items are disposed of. For the purposes of this order, any articles in a set, such as a kitchen table and chairs, a china or silverware service, a bedroom or living room set, etc., shall be considered a single `item'.
(10) The husband shall irrevocably designate the wife and children as equal beneficiaries of not less than $250,000, in the aggregate, of his Great American Life Insurance policy, until the youngest child reaches age 18. As each child reaches 18, his portion shall be allocated to the wife and remaining children. The husband shall execute and deliver an authorization to the wife so that she may determine, from time to time, the status and good standing of said policy.
(11) The husband shall maintain the children on his health insurance policy until each such child reaches the age of 19; he shall continue the wife as a covered dependent under COBRA or applicable state law for the statutory period. The parties shall equally split the premium expense for the wife under COBRA and any uncovered, unreimbursed health expenses for. the children equally. His obligation to pay one half of the wife's premium shall terminate upon the end of the statutory period, the wife's remarriage or cohabitation, or the availability of health insurance through her employment, and shall be deemed alimony, deductible by the husband, income to the wife, and shall be otherwise nonmodifiable. An order pursuant to General Statutes § 46b-84(d) shall enter.
(12) Each party shall pay his or her own attorney's CT Page 423 fees.
(13) Each party shall pay the sole liabilities reported on their respective financial affidavits; and any remaining joint credit card bills (after the application of the $10,000) shown on the parties' affidavits shall be shared equally.
(14) In accord with their agreement, the parties shall cooperate in filing joint federal and state income tax returns for 1995; any refunds or liabilities shall belong to the husband. Any capital gains tax liability attributed to the sale of the marital dwelling shall be apportioned: wife, 60 percent; husband, 40 percent.
(15) All instruments and documents necessary or incidental to the effectuation of these orders shall be completed by the parties and exchanged within thirty days hereof.
Teller, J.